UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
 KIMBERLY BERNARD,

                                 Plaintiff,

             -against-

THE CITY OF NEW YORK, MAYOR ERIC ADAMS,
NYPD COMMISSIONER KEECHANT SEWELL,
NYPD COMMISSIONER EDWARD CABAN, NYPD
CHIEF OF DEPARTMENT JEFFREY MADDREY,
NYPD CHIEF OF PATROL JOHN CHELL, NYPD
ASSISTANT CHIEF JAMES N. MCCARTHY, NYPD
DETECTIVE JACKSON DAGOBERT, DEPUTY
COMMISSIONER OF OPERATIONS KAZ
DAUGHTRY, and NYPD MEMBERS JOHN OR JANE
DOE # 1 – 15,

                                 Defendants.
------------------------------------------------------------------------X

**VERIFIED COMPLAINT**

Index No.:

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Plaintiff, **KIMBERLY BERNARD**, by her attorneys, **KAISHIAN & MORTAZAVI LLC**, by

**MARYANNE K. KAISHIAN, ESQ.,** an attorney duly licensed to practice before the United

States District Court for the Eastern District of New York, hereby complains of Defendants as

follows:

**PRELIMINARY STATEMENT**

      1.     Defendant City and its policymakers have fostered a system in which sexual assault

victims not only have their cases mishandled by the Department but in which these victims, such

as Plaintiff, are subjected to further harm, including through the misappropriation of their personal

information for retaliatory purposes by Department members.

      2.     Plaintiff now brings the instant Complaint for, *inter alia*, First Amendment

retaliation, defamation, due process violations, and discrimination against a victim of a sexual

offense before this Court.

## PARTIES

3.      **PLAINTIFF**, **KIMBERLY BERNARD** is, and was at all times relevant, a resident of New York County, City and State of New York.

4.      At all relevant times mentioned herein, **DEFENDANT CITY OF NEW YORK (“Defendant City” or “New York City”)**, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department (“NYPD”), and their employees.

5.      **DEFENDANT NEW YORK CITY MAYOR ERIC ADAMS (“Defendant Mayor”)** was at all times relevant to this Complaint the Mayor of New York City. As Mayor, Defendant Mayor, at all relevant times, was an elected officer and the “chief executive officer of the city,” New York City Charter § 3, and had final authority to appoint and/or remove any NYPD employees and agents, including the New York City Police Commissioner. As Mayor, Defendant Eric Adams may, with the consent of the district attorney, also increase or decrease the number of positions within the district attorney’s office. New York County Law § 931. He is sued individually and in his official capacity.

6.      **DEFENDANT NYPD COMMISSIONER KEECHANT SEWELL (“Defendant Sewell”)** was, at all times relevant to this Complaint prior to June 13, 2023, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Sewell, personally and/or through her authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD

officers' performance of their duties, and constituted a City policymaker for whom the City is liable. She is sued individually and in her official capacity.

7.    **DEFENDANT NYPD COMMISSIONER EDWARD CABAN ("Defendant Caban")** was, at all times relevant to this Complaint after June 13, 2023, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Caban, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. He is sued individually and in official capacity.

8.    **DEFENDANT NYPD CHIEF OF DEPARTMENT JEFFREY MADDREY ("Defendant Maddrey")** was, at all relevant times, a supervisor and policymaker within the NYPD. Prior to December 2, 2022, Defendant Maddrey was the NYPD's Chief of Community Affairs and Chief of Housing before being promoted to Chief of Patrol. On December 2, 2022, Defendant Maddrey was promoted again to Chief of Department. In these roles, at all relevant times, Maddrey had policymaking authority over the Department. At all relevant times, Defendant Maddrey had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him, and Defendant Maddrey constituted a policymaker for Defendant City. He is sued individually and in his official capacity.

9.    **DEFENDANT NYPD CHIEF OF PATROL JOHN CHELL ("Defendant Chell")** was, at all relevant times, a supervisor within the NYPD. From May 3, 2019, through December 2, 2022, Defendant Chell was a First Deputy Chief with the NYPD. Beginning on or

about December 2, 2022, Defendant Chell was promoted to Chief of Patrol of the NYPD. At all relevant times, Defendant Chell had policymaking authority over the Department. At all relevant times, including as Deputy Chief and Chief of Patrol, Defendant Chell had primary responsibility for NYPD patrol operations. NYPD uniformed members of the service were obligated to obey any lawful order given by Defendant Chell, and Defendant Chell constituted a policymaker for Defendant City. He is sued individually and in his official capacity.

10. **DEFENDANT NYPD ASSISTANT CHIEF JAMES N. MCCARTHY ("Defendant McCarthy")** was, at all relevant times, a supervisor and policymaker within the NYPD. As Assistant Chief, Defendant McCarthy was the Commanding Officer of the NYPD Patrol Borough Manhattan South, and had significant control over the NYPD precincts and members within his command, specifically the 7th Precinct, and was responsible for policymaking and directives regarding the same. He is sued individually and in his official capacity.

11. **DEFENDANT NYPD DETECTIVE JACKSON DAGOBERT ("Defendant Dagobert")** was, at all relevant times, Detective 1st Grade within the NYPD officially assigned to the NYPD's 13th Precinct in Manhattan and/or Patrol Borough Manhattan South. However, upon information and belief, at all relevant times, Detective Dagobert was assigned to Defendant Assistant Chief McCarthy's personal NYPD unit that functioned within the NYPD's paramilitary structure but was not listed as part of any publicized record, including the NYPD's Officer Profile site. As a member of Defendant McCarthy's unit, Defendant Dagobert's employment duties included protest-related enforcement, providing personal assistance to Defendant McCarthy, providing security for Defendant McCarthy, accompanying Defendant McCarthy during tours, and driving and/or securing transportation for Defendant McCarthy. Defendant Dagobert frequently does not wear an NYPD uniform and does not don a visible badge number, identification, or other

police signifiers in public appearances and enforcement actions. At all relevant times, Defendant Dagobert was an appointed and acting officer, servants, employee, and/or agent of Defendant City who was acting for, on behalf of, and with the power and authority vested in them by Defendant City and were otherwise performing and engaging in conduct incidental to the performance of his lawful functions in the course of his NYPD duties. He is sued personally and in his official capacity.

12. **DEFENDANT DEPUTY COMMISSIONER OF OPERATIONS KAZ DAUGHTRY ("Defendant Daughtry")** is the Deputy Commissioner of Operations for Defendant City[1]; in May 2023, Defendant Daughtry was the head of the NYPD's Community Affairs Bureau. On July 17, 2023, Defendant Daughtry was promoted to Assistant Commissioner of Operations, making him the Liaison to City Hall and the Chief of Staff to Defendant Maddrey before his promotion to Deputy Commissioner of Operations. At all relevant times, Defendant Daughtry was an NYPD supervisor with decision-making and policy powers, and all individuals under him in the paramilitary structure of the NYPD were required to follow orders issued by this Defendant. As head of Community Affairs, and in all subsequent roles, Defendant Daughtry was responsible for daily administrative decision-making, policymaking, making official NYPD communications, crafting and representing the positions of the Administration and NYPD to the public, and executing the directives of Defendant Mayor, Defendant Commissioner, and Defendant Chief of Department. At all relevant times, Defendant Daughtry constituted a

---

[1] Defendant Daughtry's role as either a civilian executive within the Adams Administration or an executive of the NYPD is unclear, as Daughtry is listed as "inactive" on NYPD member roles, but openly carries a gun and engages in police enforcement, a dichotomy that has yet to be addressed directly by either the Department or the Administration, and which permits him to avoid responsibility for policing misconduct through the Civilian Complaint Review Board. *See*, *e.g.*, Yoav Gonen, *Police Review Board Dropped Three Complaints Against Veteran Detective After Unusual Promotion to Top Brass*, The City (Aug 8, 2024), *available at*: https://www.thecity.nyc/2024/08/08/nypd-complaints-dropped-daughtry/ (last visited Aug 8, 2024). While Plaintiff intends to seek clarification as to Defendant Daughtry's role from Defendant City, his policymaking authority on behalf of Defendant City is evident.

policymaker on behalf of Defendant City. Upon information and belief, at the time of the events detailed herein, Defendant Daughtry was one of a small number of individuals within the NYPD with access to official NYPD social media accounts, including those assigned to the Department and Defendant Maddrey, and was further responsible for issuing official public releases of information, even prior to his public and formal assumption of these responsibilities within the Department in July 2023. Defendant Daughtry is sued individually and in his official capacity.

13.     **DEFENDANT NYPD MEMBERS JOHN or JANE DOE # 1 – 15**, whose true identities are not yet known, are referred to herein collectively and fictitiously as "Defendant NYPD Does," or "Defendant Does # 1 – 15." At all relevant times these Defendants were employed by Defendant City as members of the NYPD.

14.     At all times hereinafter mentioned, all individual Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

15.     Each and every act and omission by the individual Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

16.     The individual Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, on behalf of, and with the power and authority vested in them by Defendant City and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

17.     All Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the

unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

18.    At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

19.    Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants take any steps to intervene in, the abusive and/or constitutionally and legally deficient conduct of their colleagues.

20.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority.

21.    Each individual Defendant is sued in her or his individual and official capacities.

## JURISDICITON AND CONDITIONS PRECEDENT

22.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and 42 U.S.C. § 1983.

23.    Venue is proper, pursuant to 28 U.S.C. § 1391, *et seq.*, in the Southern District of New York, where a majority of the actions complained of herein occurred.

24.    The monetary damages amount sought by Plaintiff exceeds $150,000.00.

25.    Though Plaintiff retained counsel more than ninety (90) days after the incident, Plaintiff timely submitted a Petition for a Late Notice of Claim pursuant to New York State General Municipal Law (GML) § 50-E in New York County Supreme Court, which governs Plaintiff's

New York State law claims including negligence, New York State constitutional violations, and violation of Plaintiff's fair trial rights. This Petition is pending in New York County Supreme Court.

26.    Plaintiff's Federal claims and claims brought pursuant to NYC Admin. Code §§ 8-802, *et seq*., have been timely filed within three (3) years of their accrual.

27.    Plaintiff has met all conditions precedent for proceeding with her claims under Federal and City law.

## STATEMENT OF MATERIAL FACTS

28.    On or about May 8, 2023, Ms. Bernard participated in a public demonstration in New York County calling for accountability following the public killing of Jordan Neely in the New York City transit system.[2]

29.    Despite arriving shortly after Mr. Neely was killed, NYPD members declined to arrest the white man who killed Mr. Neely, who was Black, at the scene.[3]

30.    Multiple witnesses on the subway car observed and filmed the man kill Mr. Neely by placing him in a chokehold until he lost consciousness and maintaining the chokehold until Mr. Neely died.[4]

31.    The May 8, 2023, demonstration called for both accountability from Mr. Neely's killer and police accountability for the lack of action taken by responding NYPD members.

32.    On or about the evening of May 8, 2023, several demonstrators were assaulted and/or arrested by NYPD members during this public demonstration for accountability.

---

[2] *See* Samantha Max, *A year later, a passenger on the F train where Jordan Neely died is still reeling*, GOTHAMIST (May 1, 2024), *available at*:
 https://gothamist.com/news/a-year-later-a-passenger-on-the-f-train-where-jordan-neely-died-is-still-reeling (last visited Aug 5, 2024).
[3] *Id*.
[4] *See* Lisa Miller, *Finding Jordan Neely*, NEW YORK MAGAZINE (Dec. 29, 2023), *available at*:
https://nymag.com/intelligencer/article/jordan-neely-death-subway.html (last visited August 1, 2024).

33.    Approximately thirteen (13) individuals were arrested, including the award-winning photojournalist Stephanie Keith, who was actively photographing the demonstration.[5]

34.    Present for and directly participating in these arrests were Defendants Chief of Patrol John Chell, Assistant Chief James McCarthy, and Deputy Commissioner Kaz Daughtry among other high-ranking NYPD officials and additional NYPD members, including those assigned to the NYPD's Strategic Response Group (SRG) and Community Affairs Bureau.

35.    Defendant Chief of Patrol John Chell was recorded on video ordering Stephanie Keith's arrest while repeatedly shouting, "Lock her up!"[6]

36.    Defendants Chell and Deputy Commissioner Kaz Daughtry were captured on camera assaulting another demonstrator by throwing her into a metal pole before tackling her to the ground and placing her under arrest.[7]

37.    Following these wrongful arrests, at approximately 9:00 PM on May 8, 2023, Ms. Bernard traveled from the site of the demonstration, located near the Broadway-Lafayette subway station on E. Houston St. in New York County, to the NYPD's 7th Precinct, located at or near 19 Pitt St., New York County, to provide support for these arrested individuals upon their release.[8]

38.    This support for arrested individuals is a common and lawful occurrence following mass arrests. Though taking place primarily in public spaces outside NYPD precincts or Central

---

[5] https://www.nydailynews.com/2023/06/29/veteran-photojournalist-arrested-at-jordan-neely-protests-asks-judge-and-da-alvin-bragg-to-clear-her-name-protect-journalists-ability-to-work-in-nyc/.

[6] This is a common refrain among the American political rightwing. *See, e.g.*, Peter Wade, *Trump Denies Ever Saying 'Lock Her Up.' He Did … Several Times* ROLLING STONE, https://www.rollingstone.com/politics/politics-news/trump-denies-saying-lock-her-up-clinton-1235031145/ (last visited July 31, 2024).

[7] *See* Graham Rayman, *High ranking NYPD official accused in lawsuit of body slamming woman during Jordan Neely vigil*, DAILY NEWS (Aug 8, 2024), *available at*: https://www.nydailynews.com/2024/08/08/high-ranking-nypd-official-accused-in-lawsuit-of-body-slamming-woman-during-jordan-neely-vigil/ (last visited Aug. 8, 2024).

[8] *See* Gwynne Hogan and Katie Honan, *Adams Says 'Agitators That Came From Outside Our City' Planted Molotov Cocktail at Protest Against Jordan Neely's Killing*, The City (May 8, 2023), *available at*: https://www.thecity.nyc/2023/05/08/eric-adams-jordan-neely-protest-molotov-cocktail-agitators/ (last visited Aug. 2, 2024).

Booking in accordance with typical arrest and processing procedure, this type of support is frequently called "jail support."

39.    During the evening hours between May 8, 2023, and May 9, 2023, beginning at approximately 10:00 PM, NYPD members, including Defendants Assistant NYPD Chief McCarthy, Chell, and Daughtry, targeted Ms. Bernard and other individuals offering jail support for arrest.

40.    Ms. Bernard was lawfully present on a public sidewalk and was committing no crimes when Respondent City's agents targeted her for arrest.

41.    Ms. Bernard obeyed all lawful commands issued by NYPD members.

42.    Nevertheless, Defendant Assistant NYPD Chief McCarthy, Defendant Detective Jackson Dagobert, and Defendant NYPD Does # 1 – 5, each Defendant Doe appearing to be white males wearing white shirts indicating a supervisory and/or executive position within the NYPD, and Defendant NYPD Does # 6 – 10, each appearing to be police officers assigned to the NYPD's Strategic Response Group (SRG), rushed towards Ms. Bernard without issuing any lawful order or warning. *See* **Exhibits 2-3**.

43.    These Defendants surrounded Ms. Bernard, and Defendant McCarthy forcibly grabbed Ms. Bernard's arms and shoved her into a brick building façade before pinning her against the wall.

44.    These actions caused Ms. Bernard serious pain and suffering, including bruising, lacerations, and swelling to her face, arm, shoulders, and knees.

45.    Defendant McCarthy then yanked Ms. Bernard's hands behind her back and applied overly tight handcuffs to Ms. Bernard's wrists.

46.    Ms. Bernard did not resist arrest, and this use of force against her was excessive.

47.    Ms. Bernard was then escorted by Defendant NYPD Does # 9 and 10, who each appeared to be white men and were assigned to the NYPD's Strategic Response Group (SRG), into the 7th Precinct.

48.    Ms. Bernard's arrest was personally directed and overseen by Defendants Chell, Maddrey, and Daughtry, who were each present at the scene of her arrest and were each present inside of the NYPD's 7th Precinct to supervise Ms. Bernard's processing and detention.

49.    Defendant NYPD Does # 11 and 12, who each appeared to be female officers, believed to be assigned to the 7th Precinct, each searched Ms. Bernard multiple times, finding no contraband.

50.    Ms. Bernard repeatedly requested that Defendant Does # 9 – 12 loosen the overly tight handcuffs, which were causing serious pain to her wrists. Defendants refused.

51.    Defendant NYPD Does # 9 – 12 denied Ms. Bernard requested medical care, food, and potable water during her time in NYPD custody.

52.    Defendants, including Defendant McCarthy, Chell, Maddrey, and Daughtry, provided false information regarding Ms. Bernard and the circumstances of her arrest that was reasonably likely to influence a finder of fact to the Manhattan District Attorney's Office in order to induce the criminal prosecution against her.

53.    At approximately 10:20 PM, in remarks made to members of the press, Respondent Mayor Eric Adams referred to those present at the demonstration earlier that day, including Ms. Bernard, as "agitators that come from outside our city with Molotov cocktails."[9]

54.    At approximately 11:00 PM, Defendants Chief of Department Jeffrey Maddrey and

---

[9] *See* Gwynne Hogan and Katie Honan*, Adams Says 'Agitators That Came From Outside Our City' Planted Molotov Cocktail at Protest Against Jordan Neely's Killing*, The City (May 8, 2023), *available at*: https://www.thecity.nyc/2023/05/08/eric-adams-jordan-neely-protest-molotov-cocktail-agitators/ (last visited Aug. 2, 2024).

Chief of Patrol Chell held a public press conference falsely alleged the recovery of a "Molotov cocktail" from the scene of the jail support action. These Defendants generalized blame regarding the alleged "Molotov cocktail," broadly blaming "the crowd," of which Ms. Bernard was a part, for its alleged placement.[10]

55.     Following Ms. Bernard's arrest and while she remained in NYPD custody at approximately 12:50 AM on May 9, 2023, Defendant NYPD Doe # 13, an individual with designated access to and/or authority over official NYPD communications accounts, tweeted a photograph from the official NYPD Twitter account, @NYPDnews, claiming that NYPD members had recovered a "Molotov cocktail," allegedly constructed using a Topo Chico brand mineral water bottle, at the scene of Ms. Bernard's arrest. *See* **Exhibit 4** and ¶ 56, *infra*, depicting @NYPDnews tweet and purported "Molotov cocktail."

56. 



57.    There was no further evidence offered in support of this allegation.

58.    Ms. Bernard did not possess, and was neither reasonably suspected nor accused of possessing, a Molotov cocktail or any other incendiary device or weapon.

59.    No demonstrator present at any of the actions involving Ms. Bernard was ever charged in relation to the alleged "Molotov cocktail."

60.    Ms. Bernard did not engage or plan to engage in any violent conduct, nor was she reasonably suspected or accused of doing so or of planning to do so.

61.    Ms. Bernard spent approximately twenty-three (23) hours in NYPD custody prior to her arraignment at approximately 7:00 PM in New York County Criminal Court on May 9, 2023.

62.    As a result of the false allegations provided by Defendants to the Manhattan District Attorney's Office, Ms. Bernard was charged with Penal Law (P.L.) § 140.10, trespass, a B misdemeanor, and P.L. § 195.05, Obstruction of Governmental Administration, an A misdemeanor. *See* **Exhibit 1**.

63.    The New York County District Attorney declined to prosecute Ms. Bernard for any terrorism-related charge or enhancement.[11]

64.    Ms. Bernard's arraignment charges allegedly stemmed from her presence and participation at a protest in the Broadway-Lafayette subway station on May 6, in which protestors peacefully called for accountability for Jordan Neely's death, and occupied the station for approximately fifteen (15) minutes, the approximate amount of time that Jordan Neely was restrained and strangled before he died.

---

[11] *See* Matthew Euzrraga, *NYC subway chokehold protester calls out NYPD for charges: 'Outrageous'* Pix11 (May 8, 2024), *available at*: https://pix11.com/news/local-news/nyc-subway-chokehold-protester-calls-out-nypd-for-charges-outrageous/ (last visited Aug 8, 2024).

65.     Following her arraignment on the two misdemeanor charges, Ms. Bernard was released on her own recognizance. The charges against her did not include any allegation of violent intent or conduct.

66.     Moreover, even if the allegations against her were true, the charges should have subjected Ms. Bernard to the issuance of a summons or Desk Appearance Ticket in lieu of her custodial arrest in accordance with New York State Criminal Procedure Law (C.P.L.) § 150.20.

67.     The charges against Ms. Bernard terminated in her favor with a complete dismissal issued in New York County Criminal Court on June 16, 2023. *See* **Exhibit 1**, Certificate of Disposition.

## DEFENDANTS' POST-PROTEST CONDUCT

68.     Nevertheless, Defendants continued to push the false narrative that Ms. Bernard and other demonstrators were reasonably suspected of violent and terroristic conduct and/or intent.

69.     On May 9, 2023, and May 10, 2023, including after Ms. Bernard's processing, arraignment, and/or release on her own recognizance on two misdemeanor charges only, Defendant NYPD Member Does # 13 – 15 authorized and/or directed and/or participated in the widespread public dissemination of Ms. Bernard's image and identifying personal information alongside false allegations that Ms. Bernard remained wanted and was suspected of terrorism-related charges.

70.     This information was widely disseminated via NYPD press advisory to members of the media and to the public.

71.     Defendants Adams, Chell, Daughtry, Maddrey, and Does # 13 – 15 knowingly and falsely disseminated information indicating Ms. Bernard's involvement in violent and/or

terroristic activity.

72.     This false release included Ms. Bernard's home address, where she lived with her three minor children.

73.     This information caused Ms. Bernard to fear for the lives and safety of herself and her children.

74.     Two days later, on May 12, 2023, the NYPD issued a release concerning Daniel Penny ("Penny"), who killed Jordan Neely while being recorded in a public subway car, in the same format as the May 9 and May 10 releases concerning Ms. Bernard.

75.     These two press releases differed in critical ways.

76.     Defendants did not dox Penny by releasing his home address and placing his family at risk, but elected to do so to Plaintiff, a Black woman who had been critical of the NYPD response to Penny's public killing of a Black man.

77.     The release concerning Penny was also devoid of detail—particularly when compared to the NYPD's sensationalized release concerning Plaintiff—indicating only that Penny was accused of manslaughter. *See* **Exhibit 5.**

78.     Defendants listed four separate charges against Ms. Bernard: "Crime of Terrorism: Tampering; Unlawful Interference with a Train; Obstructing Governmental Administration; Criminal Trespass."

79.     There is no distinct "Crime of Terrorism: Tampering" charge in New York's Penal Code, but rather an enhancement that was in no way justified by any conduct undertaken by Ms. Bernard.

80.     Defendants intentionally utilized this language and intentionally misrepresented the law and facts to the public to influence finders of fact against Ms. Bernard, to even further inflate

the list of supposed charges against her, to interfere with her right to a fair trial, and to punish her for the content of her speech.

81.     Furthermore, pursuant to P.L. § 490, a Crime of Terrorism enhancement would have enhanced a non-violent criminal tampering charge related to interference with a public utility under P.L. § 140.25, Criminal Tampering, to a C-level violent felony under P.L. § 490.25.

82.     In New York State, C violent felonies carry a mandatory minimum prison term of three-and-a-half (3.5) years. P.L. § 70.02, *et seq.*

83.     In New York State, manslaughter in the second degree, with which Penny was ultimately charged and indicted, is a non-violent C felony that carries a no mandatory minimum sentence. P.L. § 70.00.

84.     Defendants publicly advocated for and/or attempted to induce and/or publicly justified the equal or greater mandatory minimum exposure to incarceration for Ms. Bernard than for Penny.

85.     Defendants declined to include or speculate as to the highest charge with which Penny might have been charged for choking a person to death over several minutes in a caught-on-camera killing.

86.     Defendants declined to enumerate other charges against Penny, who, prior to the release, had, in fact, been formally charged and arraigned on both P.L. § 125.15, Manslaughter in the Second Degree, *and* P.L. § 125.10, Criminally Negligent Homicide.

87.     Defendants declined to include the level of manslaughter or any possible sentencing enhancements or aggravating elements against Penny.

88.     Defendants declined to state Penny's charges using language likely to be recognized by the lay public as intentional and/or violent, such as by including the term

"homicide" (or "terrorism").

89.    Penny was permitted to privately pre-arrange his self-surrender with the NYPD and the assistance of counsel on the date of his arraignment, and he spent less than eight (8) hours in NYPD custody on manslaughter and negligent homicide charges.

90.    Plaintiff was assaulted and arrested while providing lawful jail support to other demonstrators in support of police accountability.



91.    Defendant McCarthy (right), seen arresting and escorting Plaintiff after assaulting her in front of the NYPD's 7th Precinct, is depicted in the image included in ¶ 89, *supra*.

92.    Defendant NYPD members repeatedly, publicly, and intentionally accused Ms. Bernard of terrorism-related conduct, despite full knowledge that this allegation was false, and even after this arrest charge was rejected by the reviewing prosecuting agency, the New York

County District Attorney's Office.

93.    Defendant NYPD members repeatedly, publicly, and intentionally connected Ms. Bernard's arrest to the unsubstantiated and generalized claim of a "Molotov cocktail" while accusing her of acts of "terrorism," despite full knowledge of the falsity of these claims and the implications these allegations would have on Ms. Bernard's reputation and safety.

94.    At no time did any Defendant NYPD members intervene in the wrongful conduct of their colleagues or otherwise act to mitigate the dangers this conduct posed to Ms. Bernard, despite possessing both notice and opportunity to do so.

## **DAMAGES**

95.    As a result of Defendants' conduct, Ms. Bernard has suffered physical and emotional injuries, pain, and suffering, the effects of which are ongoing. The full extent of Ms. Bernard's injuries is not yet known.

96.    As a result of Defendants' conduct, Ms. Bernard has been forced to expend costs, including travel, housing, and treatment-related costs for herself and her children.

97.    As a result of Defendants' conduct, Ms. Bernard suffered injuries including swelling, bruising, lacerations, and reduced range of motion to her arms, legs, and wrists, greatly interfering with her daily life.

98.    As a result of Defendants' conduct, Ms. Bernard suffered emotional anguish, depression, anxiety, fear of death, and post-traumatic stress, and additional psychological damages.

99.    Defendants' conduct interfered with Ms. Bernard's property and liberty interests, including in the quiet enjoyment of her home, professional advancement, wages, and her freedom during her detention and return to court on at least one (1) occasion.

100.    Defendants' conduct was not content-neutral, as it was significantly related to the substance of Ms. Bernard's speech, which was critical of the NYPD, and was carried out in retaliation for this speech and/or in an attempt to deter Ms. Bernard from participating in future protected conduct.

101.    Ms. Bernard's participation in protected speech and/or conduct was in fact chilled by Defendants' actions against her.

## BACKGROUND

### THE NYPD'S HISTORY OF PERMISSIVE RESPONSES TO PRO-POLICE DEMONSTRATORS

102.    The NYPD's violent response to protesters who were demonstrating for police accountability is dramatically different from their response to rightwing and pro-police protestors, including, as here, when interacting with people espousing different viewpoints about the police regarding the same incident(s).

103.    The NYPD did not dox Daniel Penny by releasing his home address and placing his family at risk, but elected to do so to Plaintiff, a Black woman who had been critical of the NYPD response to Penny's public killing of a Black man.

104.    This is consistent with the NYPD's history of protest-related responses.

105.    On July 12, 2020, a pro-police "Blue Lives Matter" march was orchestrated in Bay Ridge, Brooklyn.[12] The march was also attended by counter-protestors organized against police brutality.[13] Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested,

---

[12] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.
[13] *Id.*

both of whom were Black men protesting police brutality.[14] By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[15]

106.     The day before, on July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces.[16]   The NYPD made no arrests at the rally.[17]

107.     In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[18]

108.     On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[19]

---

[14] *Id.*

[15] *Id.*

[16] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, GOTHAMIST, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

[17] *Id.*

[18] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, GOTHAMIST, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

19 AP, Jews For Trump car parade stirs protests, fights across NYC, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

109.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[20]

110.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[21],[22]

111.    The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present. Plaintiff incorporates the following non-comprehensive examples by reference:

> a.   In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).
>
> b.   In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[23],[24]

---

[20] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges,* GOTHAMIST, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[21] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[22] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

[23] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[24] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

c.  More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence, but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[25] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[26]

### THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS

112.    The violations suffered here by Plaintiff are at the common intersection of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia*, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

113.    The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, such as its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

114.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and batons strikes

---

[25] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video

[26] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests.[27]

115.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention.[28]

116.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[29]

117.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers.[30]

118.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

119.    Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, sexually abused while demonstrating, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has the Plaintiff in this case.

120.    In many of these cases Defendants employed tactics developed and modified over the course of many years by Defendants and their predecessors, and by other Defendant City policymakers at and in connection with other demonstrations in the City dating back to around

---

[27] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), *available at* https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[28] *See, e.g.*, N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[29] *See, e.g., Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[30] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases, which are incorporated by reference:

a.    *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.    *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c.    *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d.    *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject

arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e.   *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest;

f.   *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.   *Callaghan v. City of New York,* 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h.   *Osterhoudt v. City of New York, et al.*, No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and

in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i.    Despite then-Mayor Michael Bloomberg's recognition that "the majority of the [OWS] protesters have been peaceful and responsible,"[31] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.    In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[32] encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.    Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;

l.    The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.    The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders

---

[31] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

[32] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protesters they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

and opportunity to disperse, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n.    Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well *as* several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

o.    The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

p.    The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

q.    The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.    *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

## THE NYPD'S FAILURE TO TRAIN REGARDING PROTEST POLICING

121.    Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

122.    In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

123.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

124.    Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

125.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

126.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

127.    These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Plaintiff in this case.

128.    Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

129.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

130.    On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

131.    Defendants' failures to train, which contributed to violations of Plaintiff's rights in this case, include, *inter alia,* the following:

a.    The failure to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

b.    The failure to make clear the need for individualized probable cause to arrest in a protest context;

c.    The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies; and

d.    The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters.

## DEFENDANTS' HISTORICAL FAILURES TO MONITOR AND SUPERVISE NYPD MEMBERS' PROTEST POLICING

132.    Although Defendants City, Adams, Sewell, Maddrey, Chell, McCarthy, Daughtry, and other policymakers had actual knowledge that NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct.

133.    Indeed, despite these Defendants' presence at these demonstrations and their participation in the rampant police violence exacted there, and despite the wealth of video and

other evidence that has been widely available in the intervening months, upon information and belief, virtually no NYPD members have been meaningfully investigated or disciplined related to their conduct.

134.    In fact, multiple Defendants involved, including Defendant Daughtry, have since been promoted within the Department to positions with even greater policymaking authority and control over official NYPD communications to the public.

**STATE AND CITY OFFICIAL REPORTS NYPD PROTEST RESPONSES**

135.    In July 2020, the New York State Office of the Attorney General ("AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[33]

136.    Plaintiff herein incorporates by reference into this case the facts set forth in the AG Report.

137.    The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

138.    The report specifically addressed and condemned the common NYPD practice of discrediting organizers and demonstrators—and utilizing excessive force or other abusive tactics against them—by labeling them "outside agitators" and falsely claiming police recovered weapons and other evidence of violent intent.[34]

139.    In one such incident, after NYPD members violently cracked down upon demonstrators in Mott Haven, Bronx County, in a widely-condemned show of brutal and excessive

---

[33] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.
[34] *Id*.

force, Defendant City's policymakers claimed that "gas cannister" and incendiary devices had been recovered from arrested demonstrators, and that these demonstrators were primarily "outside agitators."[35] These allegations were unfounded.[36]

140.    Human Rights Watch also addressed the Mott Haven protest and the policies and practices of the NYPD's protest-related responses in its September 30, 2020 report titled *"Kettling" Protesters in the Bronx: Systemic Police Brutality and Its Costs in the United States* (HRW Report) which Plaintiff incorporates by reference.[37]

141.    The HRW Report confirmed that allegations by the NYPD and Defendant City regarding the supposed recovery of weapons from protestors were unfounded, finding that the concerted effort to suggest otherwise "appears to have been a deliberate effort at fearmongering on the part of the NYPD to help justify their planned crackdown on a group that is known to be critical of the police and capable of mobilizing public pressure."[38]

142.    The HRW Report further identified and condemned the labeling of protestors as "outside agitators" as a tactic to suppress and delegitimize legitimate and nonviolent demonstrations using false smears and fearmongering tropes.[39]

143.    The "outside agitator" or "professional protestor" trope has significant historical context, as it was regularly weaponized against the American Civil Rights Movement of the 1950s and 1960s.

144.    Its purpose—to discredit protestors and organizers—remains the same today.[40]

---

[35] *Id.*

[36] *Id.*

[37] Human Rights Watch, *"Kettling" Protesters in the Bronx: Systemic Police Brutality and Its Costs in the United States*, Sept 2020, *available at*; https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states (last visited Aug 8, 2024).

[38] *Id.*

[39] *Id.*

[40] Jacey Fortin, *The Long History of the Outside Agitator*, THE NEW YORK TIMES, *available at*: https://www.nytimes.com/2020/06/08/us/outside-agitators-history-civil-rights.html (last visited Aug 8, 2024).

145.    In a 2020 interview with *The New York Times*, Thomas C. Holt, a professor of African-American history at the University of Chicago and civil rights activist who organized in the 1960s, said this of the "outside agitator" trope: "The notion — or rather fiction — of the 'outside agitator' was a persistent trope, especially during the early years of the civil rights movement. Part of the motivations for the charge was to sustain the myth that the locals were satisfied with things as they were, and if you could just crack down on the outsiders, the protests would cease. As the movement grew and spread, that myth became more difficult to sustain."[41]

146.    Indeed, Dr. Martin Luther King, frequently accused of orchestrating and participating in outside agitation himself, decried the label in his Letter from Birmingham Jail: "I am cognizant of the interrelatedness of all communities and states. I cannot sit idly by in Atlanta and not be concerned about what happens in Birmingham. Injustice anywhere is a threat to justice everywhere. We are caught in an inescapable network of mutuality, tied in a single garment of destiny. Whatever affects one directly affects all indirectly. **Never again can we afford to live with the narrow, provincial 'outside agitator' idea.** Anyone who lives inside the United States can never be considered an outsider."[42]

147.    Still, the utilization of this label to discredit, devalue, and undermine the positions of protestors persists, including by Defendants against Plaintiff and her fellow demonstrators for police accountability and the defense of Black lives.

---

[41] *Id.*

[42] King, M.L. (1963). Letter from Birmingham Jail. THE ATLANTIC MONTHLY, August 1963; *The Negro Is Your Brother*; Volume 212, No. 2; pages 78 - 88 (emphasis added).

148.    In December of 2020, the NYC Department of Investigation also issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[43]

149.    The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[44]

150.    In addition to noting the heavy-handed response by the Strategic Response Group (SRG) at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[45]

151.    The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

152.    The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

153.    The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

154.    According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[46]

---

[43] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18 .2020.pdf.
[44] *Id.* at 36.
[45] *Id.* at 61.
[46] *Id.* at 26.

155.    The DOI also found that Black arrestees were disproportionately charged with felonies.[47]

156.    The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[48]

157.    According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[49]

158.    Defendant City and NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to protests and/or demonstrations, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

**NYPD'S POST-2020 PROTEST RESPONSE**

159.    Despite the wealth of historical and contemporaneous notice of the deficient and abusive conduct of the NYPD in response to content-specific protests available to Defendants, and despite their notice of the dangers this conduct poses to New Yorkers such as Plaintiff, Defendants have not only failed to remediate these harms but have rewarded and protected individual NYPD members who engage in abusive behavior against demonstrators, continuing to foster a culture of selective protest suppression within the Department.

160.    Since the ascension of Defendant Adams to City Hall, Defendant City and its NYPD policymakers have repeatedly declined to take any meaningful disciplinary action—or any

---

[47] *Id.* at 27.
[48] DOI Report at 56.
[49] *Id.* at 28.

disciplinary action whatsoever—against NYPD members who have been determined to have acted in an excessively forceful or otherwise unconstitutional manner.

161.    Indeed, Defendants' policies and practices of permitting and encouraging abusive conduct—specifically protest-related responses by the NYPD—signify an endorsement, and even an escalation, from these practices by prior administrations, including those policies and practices decried in the Summer 2020 reports by the Attorney General, the DOI, Human Rights Watch, and other agencies and human rights organizations.

162.    Between 2021 and 2023, the NYPD, by Defendant Commissioner Keechant Sewell, rejected more than half of all recommendations of discipline for NYPD members made by the Civilian Complaint Review Board (CCRB).[50]

163.    The frequency with which the NYPD rejects any suggestion of repercussions for police abuse has continued to increase.

164.    In his first year as Commissioner, Defendant Caban declined to implement discipline in at least thirty (30) cases in which the NYPD members themselves had, through legal counsel, already agreed to the implementation of discipline, the highest rate in a decade.[51] By contrast, Defendant Sewell—herself retaining and/or departing from CCRB recommendations at a tremendous pace—had done this in just four (4) such matters during her first year.[52]

165.    In December 2023, for example, Defendant Caban rejected the CCRB's recommendation of discipline for NYPD members who intentionally drove NYPD vehicles into a

---

[50] *See* Maria Cramer, *N.Y.P.D. Rejected Over Half of Review Board's Discipline Recommendations*, THE NEW YORK TIMES (Mar 16, 2023), *available at*: https://www.nytimes.com/2023/03/16/nyregion/nypd-discipline-recommendations.html (last visited Aug 8, 2024).
[51] *See* Eric Umansky, *How the N.Y.P.D. Quietly Shuts Down Discipline Cases Against Officers*, THE NEW YORK TIMES  (June 27, 2024), *available at*: https://www.nytimes.com/2024/06/27/nyregion/how-the-nypd-quietly-shuts-down-discipline-cases-against-officers.html (last visited Aug 8, 2024).
[52] *Id.*

crowd of Black Lives Matter demonstrators in May 2020, with Defendant Caban declining to impose any discipline at all.[53]

166.    Moreover, high-ranking NYPD officials continue to personally participate in and/or direct this conduct by subordinates, modelling abusive and content-selective enforcement against protestors and fostering a policy and practice of this conduct. This was the case both before and after the injuries sustained by Plaintiff.

## POST-PROTEST NYPD CONDUCT

167.    The NYPD's deficient and harmful protest-related conduct extends beyond assaults and false arrests at the scene of demonstrations. As here, the NYPD routinely engages in the promulgation of political propaganda and false information before, during, and in the aftermath of these actions.

168.    This conduct includes false allegations of weapons and/or violence by protestors, both before and after Summer 2020, when Human Rights Watch deemed Defendant City's policymakers' false allegations of incendiary devices and assaults by protestors "to have been a deliberate effort at fearmongering on the part of the NYPD to help justify their planned crackdown on a group that is known to be critical of the police and capable of mobilizing public pressure."[54]

169.    In Plaintiff's case, Defendants falsely accused Plaintiff and others present at the NYPD's 7th Precinct to provide lawful jail support to arrested protestors of possessing a "Molotov cocktail" and engaging in violent and/or terrorism-related behavior.

170.    In another example, from May 1, 2024, an official NYPD spokesperson falsely informed the media that "someone" among a crowd of pro-Palestine demonstrators on the

---

[53] *See* Yoav Gonen, *NYPD Imposes No Discipline on Cops Who Drove SUVs into Protesters*, THE CITY (Dec 8 2023) https://www.thecity.nyc/2023/12/08/nypd-no-discipline-cops-suvs-protesters-brooklyn/.
[54] HRW Report.

Manhattan Bridge had deployed pepper spray against Defendant McCarthy during a demonstration.[55]

171.    It was immediately clear from readily available footage, and known to the NYPD, that Defendant McCarthy deployed pepper spray into his own face while attempting to utilize the chemical agent against a pro-Palestinian demonstrator.[56]

172.    Defendants McCarthy, left, and Dagobert, right, are depicted in the forefront of both images in ¶¶ 176 and 177, *infra*, in the moments after this incident.

173.



*Photo Credit: Getty Images, New York Post*

---

[55] *See* Isabel Keane, *Top NYPD cop pepper-sprays himself breaking up anti-Israel protest on Manhattan Bridge*, NEW YORK POST (May 12, 2023), *available at:* https://nypost.com/2024/05/12/us-news/top-nypd-cop-pepper-sprays-himself-breaking-up-anti-israel-protests/ (last visited Aug 8, 2024).
[56] *Id.*

174.



*Photo Credit: Getty Images, New York Post*

## DELEGITIMIZING PROGRESSIVE MOVEMENTS

175.    The misleading and intentionally polarizing term "outside agitators" continues to be utilized by Defendants to delegitimize demonstrators with whom Policymaker Defendants, and the Department, are not politically aligned.

176.    Upon information and belief, Plaintiff Kimberly Bernard is known to Defendant City and its NYPD policymakers due to her engagement in community organizing, including through the Black Women's March and Black Lives Matter movements.

177.    It is well-established that Defendant City and its NYPD maintain files and information on community organizers, including Plaintiff.[57]

178.    Defendants, including Defendants Adams, Maddrey, Chell, McCarthy, and Daughtry, are aware that Plaintiff is not an "outside agitator," and that the demonstrations in which

---

[57] The Mott Haven protests, discussed by Jake Offenhartz, *Meet The "Outside Agitator" Whose Bronx March Was Violently Cracked Down On By The NYPD*, Gothamist (June 10, 2020), *available at*: https://gothamist.com/news/meet-outside-agitator-whose-bronx-march-was-violently-crushed-nypd (last visited Aug 8, 2024).

Plaintiff participated in the wake of Jordan Neely's public killing were primarily organized by New Yorkers with legitimate concerns surrounding police accountability and the defense of Black lives.

179.    However, as has been well-documented and repeatedly condemned by investigating agencies and human rights groups alike, NYPD and City Defendants' utilization of the "outside agitator" trope is a strategic practice in which the facts are immaterial, as the purpose is to discredit and devalue protestors and their positions.

180.    This conduct continues. Defendant Chell recently appeared at least twice on the far-right media outlet *Newsmax*, in his official NYPD capacity, to validate the NYPD's violent crackdown on pro-Palestine demonstrators on college campuses.[58] Defendant Chell further opined that "outside agitators" were leading the campus movements and to further call for the expulsion of pro-Palestine students and the firing of supportive faculty from these institutions.[59]

## USE OF SOCIAL MEDIA

181.    Since Defendant Adams took office in 2022, the NYPD's DCPI and Department and City executives, including Defendants Daughtry and Chell, have continually escalated the Department's utilization of social media and public communications to aggressively and unjustifiably target individual people such as Plaintiff, and others perceived as critical of the NYPD and its tactics, including journalists, elected officials, and judges.

182.    This conduct has been so extreme as to necessitate a probe by the New York City Department of Investigation.[60]

---

[58] Jim Thomas, *NYPD's Chell to Newsmax: 'Professional Agitators' at Columbia*, NEWSMAX (May 1, 2024) https://www.newsmax.com/newsmax-tv/nypd-columbia-protests/2024/05/01/id/1163158/.
[59] Fran Beyer, *NYPD Chief of Patrol Chell to Newsmax: Expel Students for 'Hate Speech'*, NEWSMAX (May 2, 2024), *available at* https://www.newsmax.com/newsmax-tv/nypd-chief-police/2024/05/02/id/1163227/.
[60]

183.    In support of this investigation, New York City Council Speaker Adrienne Adams wrote in a letter to the DOI that the NYPD's conduct in its public communications "can plainly be construed as intimidating and dangerous."

184.    Indeed, the dangers this conduct poses to targeted individuals, such as Plaintiff, are well-established and known to Defendants.

185.    Nevertheless, this conduct was permitted to persist and escalate, and continues to persist, with the backing of Defendant Adams and other high-ranking agents and policymakers of Defendant City.

## FIRST CLAIM FOR RELIEF

### Municipal Liability

*Against Defendant City Pursuant to 42 U.S.C. § 1983 and*
**Monell v. Department of Social Services** *(436 U.S. 658 [1978]) for Defendants'*
*Violations of Plaintiff's Rights Under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution*

186.    Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

187.    Defendant City, through its policymakers including Defendant Mayor Adams, Defendant Maddrey, Defendant Chell, Defendant McCarthy, Defendant Sewell, and Defendant Daughtry, were responsible for implementing and enforcing policies and procedures on behalf of the Defendant City.

188.    The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiff to, including, but not limited to:

     a.    Public attacks against individuals who criticize, or are perceived to criticize, the Department or its members;

     b.    Excessive uses of force at protests and/or demonstrations;

    c.   Content-specific enforcement of demonstrations and/or protests;

    d.   Making allegations against individuals who engage in protests and/or demonstrations that are critical of police; and

    e.   Retaliation against individuals who criticize NYPD policies, conduct, or powerful and/or high-ranking members of the Department.

189.   All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to:

    a.   Formal policies, rules, and procedures of Defendant City;

    b.   Actions and decisions by Defendant City's policymaking agents;

    c.   Customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City and by Defendants Adams, Sewell, Caban, Maddrey, Daughtry, Chell, and other policymaking officials;

    d.   Defendant City's deliberate indifference to Plaintiffs' rights secured by the First and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD Members, despite full knowledge of the members' wrongful acts, as described herein.

## <u>SECOND CLAIM FOR RELIEF</u>

### First Amendment Retaliation

***Against Defendants Maddrey, McCarthy, Daughtry, Chell, and Does # 13 – 15 Pursuant to <u>42 U.S.C. § 1983</u> for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

190.   Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

191.   Defendants imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in making Plaintiff the victim of hostile, defamatory, and violent public smear and harassment campaign, in interfering with Plaintiff's potential investors and/or partners and/or business interests, in subjecting Plaintiff to Defendants' harmful policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

192.   Defendants further engaged in retaliation against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, including, *inter alia*, her protected conduct in:

a.   Criticizing Defendants' positions regarding the lack of discipline for NYPD members who commit acts of violence and the continued subjection of New Yorkers to the same;

b.   Publicly opposing the NYPD's response to the killing of Jordan Neely;

c.   Associating with organizers and/or demonstrators who advocate for police accountability and/or the defense of Black lives;

d.   Associating with individuals who lawfully recorded and/or lawfully questioned Defendants; and

e.   Associating with like-minded individuals for the purpose of community engagement and advocacy.

193.   Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

194.   Defendants engaged in the acts and omissions complained of herein to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

195.   Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

196.   Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of his First Amendment rights.

197.   Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

198.   Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

199.   Upon information and belief, Defendants did not subject other others similarly situated to Plaintiff in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

200.   Plaintiff suffered actual chill, including in that Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident, including his right to be lawfully present in public spaces and/or to associate with neighbors and members of his community; and/or suffered adverse effects on his protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

201. Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in detaining and assaulting Plaintiff subjected Plaintiff to the violations of their First Amendment rights described elsewhere herein.

202. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### THIRD CLAIM FOR RELIEF

**Failure to Train and/or Supervise**

***Against Defendants City, Adams, Sewell, Caban, Maddrey, McCarthy, Daughtry, Chell, and NYPD Supervisor Does Pursuant to 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978)***

203. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

204. Defendant City and its policymaker Defendants failed to train and supervise the Defendant NYPD members.

205. All individual Defendants were employees and/or agents of Defendant City and were acting within the scope of their employment at the time of the conduct giving rise to Ms. Bernard's injuries.

206. Defendants knew or should have known that Defendant NYPD Members were likely to violate the constitutional rights of individuals in their custody.

207. Defendants know that NYPD Members are certain to regularly encounter circumstances described herein, including investigating an incident involving sexual assault, interacting with victims of gender-based violence, handling sensitive and private victim

information, and being subjected to criticism related to their conduct while on duty, through the course of their employment.

208.   Defendants knew that there is a history of wrongful conduct in these scenarios by NYPD Members.

209.   Defendants further knew that training and/or supervision could ameliorate the potential harms of constitutional violations in these scenarios, including civil rights violations and physical and emotional injuries.

210.   Nevertheless, Defendants failed to train its agents and/or employees regarding their conduct during the scenarios described herein and further failed to supervise its agents and/or employees when engaged in high-risk contact.

211.   By failing to train and supervise Defendant NYPD Members, these Defendants exhibited a conscious disregard and/or deliberate indifference for the risks posed by NYPD members' conduct absent adequate training and supervision.

## FOURTH CLAIM FOR RELIEF

### Negligent Screening, Hiring, and Retention

*Against Defendants City, Adams, Sewell, Caban, Maddrey, Daughtry, and Chell Pursuant to 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978)*

212.   Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

213.   All Defendants were employees and/or agents of Defendant City and were acting within the scope of their employment at the time of the conduct giving rise to Plaintiff's injuries.

214.   Defendant City, by its policymakers, knew that the individual Defendants had a propensity for the conduct giving rise to Plaintiff's injuries.

215.    This conduct includes propensity for willingness to lie, including under oath and/or to serve an agenda; retaliatory actions against individuals who complain of mistreatment and/or abuse by NYPD members; the abuse and harassment of women; and propensity for violence.

216.    This propensity was evinced through instances of Defendants' misconduct and abuse, including instances known to Defendants, and further including, but not limited to, publicly available evidence such as those instances detailed in preceding paragraphs.

217.    Defendants failed to adequately screen, hire, or retain employees in consideration of such employees' recognizable propensity for harm.

218.    Indeed, and as described herein, individual Defendants have repeatedly been promoted, empowered, and validated by Defendant City and its supervisor/policymaker Defendants with the NYPD.

219.    Plaintiff was injured as a result of Defendants' conduct.

## FIFTH CLAIM FOR RELIEF

### Failure to Intervene

### *Against All Defendants Pursuant to 42 U.S.C. § 1983*

220.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

221.    The Defendant City, by its agents, had a special duty to Plaintiff and possessed sufficient knowledge that inaction would lead to the harms suffered by Plaintiff.

222.    Defendants witnessed and/or knew of the harmful conduct of fellow Defendants and merely observed and/or unreasonably ignored such conduct against Plaintiff.

223.    At no time did any Defendants intervene in this conduct or otherwise mitigate the dangers this conduct posed to Plaintiff.

224.    Defendant City and its employees and/or agents breached the existing duty to protect Plaintiff, and such inaction enabled and/or facilitated and/or exacerbated the harms caused by Defendants' conduct and suffered by Plaintiff.

## SIXTH CLAIM FOR RELIEF

### Excessive Force

*Against Defendants McCarthy and NYPD Does # 9-12 Pursuant to 42 U.S.C. § 1983 for Violations of Plaintiffs' rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

225.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

226.    Defendants' use of excessive force against Plaintiffs were unjustified, objectively unreasonable, and clearly intended as punishment when taking into consideration the facts and circumstances that confronted Defendants.

227.    As a result of Defendant's acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

228.    At no time did any Defendants intervene in the impermissible and/or abusive and/or otherwise deficient conduct of any other Defendants.

## SEVENTH CLAIM FOR RELIEF

### Excessive Force and Unlawful Search and/or Seizure

*Pursuant to the New York State Constitution and the New York City Administrative Code Chapter 8, Title 8, § 8-801 et seq.*

229.    The NYPD Defendants are covered individuals as defined in NYC Admin. Code Ch. 8, Tit. 8, § 8-801.

230.   As described above, the Defendants violated Plaintiff's right to be free from "unreasonable searches and seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a search or seizure."

231.   Through Defendants' conduct described herein, Defendants utilized excessive force against Plaintiff and subjected her to unreasonable searches and seizures.

232.   Defendants' conduct injured Plaintiff, caused her to expend costs, deprived her of her liberty and property interests, and otherwise caused damages to Plaintiff.

233.   The NYPD Defendants and their employer, including the Defendant City, are liable to Plaintiff for this conduct and the resulting damages and injuries.

234.   Under this provision, Defendants may not invoke the defense of qualified immunity to preempt Plaintiff's suit against them.

235.   Under this provision, Plaintiff is entitled to compensatory and punitive damages, attorney's fees and costs, and an order restraining the Defendants from engaging in further violative conduct.

## EIGHTH CLAIM FOR RELIEF

### Violations of Plaintiff's Fair Trial Rights

*Against Defendants McCarthy, Maddrey, Chell, Daughtry, and Does # 13 – 15 Pursuant to 42 USC § 1983 and the Sixth and Fourteenth Amendments of the United States Constitution*

236.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

237.   NYPD Defendants were investigating officials involved in arresting and investigating the circumstances of the events described herein.

238.    While performing their duty as members of the NYPD, Defendants fabricated evidence likely to influence a jury's decision, were that information to be presented to a jury, and forwarded that information to prosecutors.

239.    Defendants disseminated false information to prosecutors, the Court, the media, and the public to intentionally misrepresent the circumstances of Plaintiff's arrest and/or Defendant City's response to this incident in an attempt to exonerate themselves of wrongdoing, discredit Plaintiff, and taint prosecutors and/or any potential jury pool and/or finder of fact.

240.    In criminal matters prosecuted by the City's five District Attorneys, "arrest charges" are initial suggestions made by the NYPD to prosecutors, which may be disregarded or rejected entirely.

241.    Arrest charges assigned by the NYPD hold no formally binding legal authority, are unilaterally determined by the NYPD, cannot be challenged or tested against evidence, and are not vetted by attorneys or prosecuting entities.

242.    Only arraignment charges are ever formally filed against an accused person and may eventually be tested against the weight of evidence, and these charges are determined by prosecutors in the county where the charges are levied.

243.    Lay members of the public are often naïve to the distinction between arrest charges and arraignment charges, and are highly likely to be prejudiced by the identification of arrest charges by the NYPD, regardless of a person's arraignment charges or ultimate case disposition.

244.    Reports by the NYPD of arrest charges hold significant weight in the public eye, a fact known to Defendants and often capitalized upon by the NYPD when determining a person's arrest charges and when improperly disseminating details of the same to the media.

245.    Indeed, Defendants Maddrey, Chell, Daughtry, and NYPD Does # 13 – 15 engaged

in this behavior to manipulate the public and potential finders of fact against Plaintiff.

246.    Furthermore, though arrest charges are not legally binding, it would be inaccurate to state they have no effect on legal proceedings.

247.    After all, arrest charges, and the underlying factual allegations, are prepared by members of the NYPD for presentation to prosecutors—and possibly the public—with the intention of initiating and influencing a criminal prosecution against the accused person.

248.    As the initial, and often only, investigating officials in a criminal matter, factual allegations and determinations of charges by NYPD members are likely to hold significant weight for the prosecuting agency.

249.    The charges and allegations as presented by NYPD members to prosecutors are likely to influence the prosecution, the finder(s) of fact, and ultimately the outcome of the accused person's case.

250.    In this matter, Defendant NYPD members falsely levied a terrorism-related arrest charge against Ms. Bernard.

251.    Defendant NYPD members repeatedly, publicly, and intentionally accused Ms. Bernard of terrorism-related conduct, despite full knowledge that this allegation was false, and even after this arrest charge was rejected by the reviewing prosecuting agency, the New York County District Attorney's Office.

252.    Defendant NYPD members publicly suggested that Ms. Bernard should be exposed to a greater mandatory minimum sentence than Jordan Neely's killer.

253.    Defendant NYPD members repeatedly, publicly, and intentionally connected Ms. Bernard's arrest to the unsubstantiated and generalized claim of a "Molotov cocktail" while accusing her of acts of "terrorism," despite full knowledge of the falsity of these claims and the

implications these allegations would have on Ms. Bernard's reputation and safety.

254.     As a result of Defendants' conduct, Plaintiff suffered a deprivation of her liberty and property interests, for which Defendants are liable.

255.     These deprivations include: Plaintiff's detention in the NYPD's custody for approximately 24 hours prior to arraignment, including in the NYPD's 7th Precinct and at Central Booking; interference with Plaintiff's right to quiet enjoyment of her home and property; causing Plaintiff to fear for her family's safety; professional wages and opportunities; requiring Plaintiff to expend housing and safety-related costs and find alternate temporary housing for herself and her minor children; and Plaintiff's mandated return to Court on during the pendency of the criminal case against her.

## NINTH CLAIM FOR RELIEF

### Equal Protection Violations

#### *Pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution*

256.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

257.     Plaintiff, compared with others similarly situated, was selectively treated by Defendants, and such selective treatment was based on impermissible considerations such as race and/or an intention to inhibit or punish the exercise of constitutional rights and/or with a malicious or bad faith intent to injure a person.

258.     Plaintiff was treated differently than an identifiable, similarly situated group of individuals for malicious reasons and/or were intentionally treated differently from others similarly situated without rational basis for this difference in treatment.

259.    Plaintiff was also treated as a "class of one" and denied equal protection when compared to individual(s) in circumstances otherwise strikingly similar to their own.

260.    Plaintiff was injured as a result of Defendants' conduct.

261.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## **TENTH CLAIM FOR RELIEF**

### **Violations of New York State Law**

### ***Pursuant to the New York State Constitution and New York State Common Law***

262.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

### **I.     *Respondeat Superior***

263.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

### **II.     Violations of the New York State Constitution**

264.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 8, 9, 11, and 12 of the New York State Constitution.

265.    Through the conduct described in the preceding paragraphs, Defendants violated Plaintiff's rights to free speech, free association, equal protection of the law, and freedom from unreasonable search and seizure.

266.    A damages remedy here is necessary to effectuate the purposes of <u>Article I, §§ 8, 9, 11, and 12</u> of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

### III.    Negligence

267.    Defendants owed a special duty to Plaintiff and breached this duty through their conduct described herein. Defendants' negligence in fulfilling their duty to Plaintiff resulted in Plaintiff's injuries and they are liable for this conduct and its resulting injuries.

### IV.    Fabrication of Evidence

268.    Defendants, including Defendants Maddrey, Chell, Daughtry, McCarthy, and Does # 13 – 15, were investigating officials in this matter.

269.    Defendants knowingly fabricated evidence likely to influence a jury and forwarded this information to prosecutors.

270.    As a result of this fabrication, Plaintiff suffered deprivations of life, liberty, and/or property, and suffered significant further physical and emotional injuries.

271.    These deprivations include: Plaintiff's detention in the NYPD's custody for approximately 24 hours prior to arraignment, including in the NYPD's 7th Precinct and at Central Booking; interference with Plaintiff's right to quiet enjoyment of her home and property; causing Plaintiff to fear for her family's safety; requiring Plaintiff to expend costs and find alternate temporary housing for herself and her minor children; and Plaintiff's mandated return to Court on during the pendency of the criminal case against her.

### V.    Negligent Infliction of Emotional Distress

272.    Defendants owed Plaintiff a duty of care and breached this duty of care through the conduct described herein, directly causing the emotional harms, including post-traumatic stress, insomnia, depression, and ongoing anxiety and fear.

### VI.    Intentional Infliction of Emotional Distress

273.    By the actions described above, Defendants engaged in extreme and outrageous conduct.

274.    Defendants intentionally caused Defendant's severe emotional distress and/or acted with a disregard for the substantial probability of causing the same.

275.    Plaintiff suffered severe emotional distress as the direct result of Defendants' conduct, which was outside the bounds of decency.

### DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

### CONCLUSION AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff respectfully seeks relief from this Court and demands judgment against the individual Defendants and the City of New York in the following forms:

i.    Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.    Actual damages in an amount to be determined at trial against Defendant City;

ii.    Statutory attorney's fees, disbursements, punitive damages, actual damages, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988, N.Y. Civ. § 28, and NYC Admin. Code §§ 8-802, *et seq.*; and

iii.     Such other relief as the Court deems just and proper.

**Dated:** Brooklyn, New York
        August 7, 2024

                        **KAISHIAN & MORTAZAVI LLC**
                        Attorneys for Plaintiff

                        By: _____
                        Maryanne K. Kaishian
                        55 Washington Street, Ste. 508
                        Brooklyn, New York 11201
                        T: (347) 662-2421
                        E: mk@kaishianlaw.com